## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL No.: 3:19-cr-200-01** |
| | * | |
| | * | |
| **VERSUS** | * | |
| | * | |
| | * | **JUDGE TERRY A. DOUGHTY** |
| **JAMARVIN K. JACKSON       (1)** | * | **MAGISTRATE JUDGE HAYES** |

### UNITED STATES' OPPOSITON TO DEFENDANT'S MOTIONS TO SUPPRESS

NOW INTO COURT, comes the United States of America, through the United States Attorney and undersigned counsel, who respectfully opposes the Defendant, Jamarvin K. Jackson's, Motions to Suppress *in globo* and states the following:

### I.   PROCEDURAL AND FACTUAL BACKGROUND

On January 26, 2019 at approximately 8:30 pm, the Family Stop and Shop convenience store located at 1403 Orange St was robbed at gunpoint. Members of the Monroe Police Department ("MPD") made contact with the store clerk who advised that a robbery had just occurred. Upon arrival, MPD made contact with the clerk who advised that he was standing behind the cash register when a black male wearing a gray hoodie, black pants, black ski mask and a black hand gun, came inside of the store and pointed a black, possibly 9mm, gun and shot at him one time. The clerk advised that the suspect then took approximately $900.00 in cash and left the store heading eastbound on foot.

MPD watched the store video surveillance and observed the suspect entering the store from the east end of the store. The suspect appeared to come from behind the store. The suspect was observed pointing a handgun at the clerk and taking cash out of the clerk's hands. The suspect then left the store heading eastbound behind the store on foot. The suspect was also wearing light color gloves during the robbery.

Responding MPD officers circulated the area for the suspect but was unable to locate him. MPD did recover a $100.00 bill from outside of the store that may have been the money the suspect took during the robbery. MPD was able to locate one 9mm shell casing from on top of the counter area, where the suspect shot from.

A review of the store surveillance video also revealed the presence and involvement of James Blackson, an individual known to MPD. Approximately one minute before the robbery, Blackson can be seen entering the store while carrying clothing on a hanger and talking on a cell phone. He walks around the store briefly (i.e., approximately 10 seconds) without purchasing anything and then leaves. Blackson walks to the west of the business as Jackson approaches from the back of the eastside of the convenience store. Law enforcement suspected that Blackson may have acted as a lookout for Jackson.

MPD conducted a post-*Miranda* interview of Blackson on February 7, 2019. Blackson denied any knowledge of involvement related to the Family Stop and Shop robbery that occurred on January 26, 2019. Subsequently MPD applied for and received a search warrant for Blackson's service provider, AT&T.

On February 18, 2019 at approximately 9:10 p.m., MPD responded to 1521 N 18 St. in reference to a battery that occurred in the 2500 block of Ferrand Street Upon arrival, the victim reported that while at an apartment located in the 2500 block Ferrand Street, Jasmine Blair and Jamarvin Jackson hit her several times with a closed fist without her permission. The victim went on to provide details related to the physical assault to MPD. MPD observed a small cut to the inside of the victim's upper lip. MPD searched the area of Ferrand Street for Blair and Jackson but was unable to locate either at that time.

Later that same evening at approximately 10:00p.m., MPD was dispatched to 2701 South Grand Street regarding a shots fired call. MPD spoke with the 911 caller and other witnesses, who each reported hearing approximately four (4) to five (5) gunshots. The on-scene witnesses also advised MPD about the earlier incident, that a dark colored sedan was seen speeding North on South Grand Street after the gunshots were heard, and their belief that Jackson was connected to this shooting incident. A search of the area revealed four (4) 9mm Luger casings on Hippolyte Avenue lying in the roadway in front of 2701 South Grand Street. There was also a bullet hole through the back glass of a Nissan Maxima bearing LA tag 705BWD belonging to the mother of the victim in the 9:10p.m. incident earlier that evening. The path of the bullet traveled from the back windshield through the driver head rest and lodged into the AC vent. MPD was able to recover the lead bullet from the car. MPD collected the casings and bullet and logged them into evidence.

Four days later on February 22, 2019, NIBIN analysis of the shell casings revealed that the weapon used in the robbery of the Family Stop & Shop matched shell casings recovered from the scene of damage to property reported to MPD on February 18th in which a several gunshots were fired at a vehicle parked in the driveway of a residence on South Grand Street.

On February 27, 2019, MPD interviewed a victim from the February 18th assaults. According to the victim, she met Jackson around July 2018 and developed a relationship with him despite being married. She advised that she met Jackson's friend, James Blackson. She described Blackson as Jackson's best friend and that they always hung out together. According to the victim, she had seen Jackson in possession of a gun in his car describing an incident when the gun slid out from underneath his seat. She described the gun as black and some kind of millimeter. From that point forward, she claims to have regularly seen Jackson with a firearm. She also provided the phone number to Jackson's cell phone, adding that the phone number was the only number used by Jackson to contact her since she first met him in July of 2018.

MPD received the results of the Blackson cell phone search warrant following the victim's interview. A review of the cell phone activity revealed that at 8:03 pm a phone call was made by Blackson to Jackson. The duration of the call was 25 minutes and 38 seconds. When compared to the time stamp of surveillance footage from Family Stop & Shop, the phone call to Jackson began prior to Blackson arriving at the store and in the view of surveillance cameras and ends around the time that

Jackson enters the business. MPD also reviewed other information including social media postings related to Blackson and Jackson and their background.

Beginning on February 28, 2019, MPD sought and obtained a series of arrest and search warrants for Jackson and Blackson. First, MPD was granted an arrest warrant for Jackson on February 28, 2019 for armed robbery, conspiracy to commit armed robbery, and possession of a firearm by a convicted felon. The arrest warrant contained the 1401 Erin Street, Apartment 265 address along with Jackson's other personal identifiers. This affidavit identified two prior felony convictions Jackson: Negligent Homicide and Second Degree Battery along with other arrests for domestic violence and possession of controlled dangerous substances. Second, MPD was granted a search for 1401 Erin Street, Apartment 265 on March 1, 2019 by the same judge that authorized the arrest warrant the previous day. The search warrant also applied to the vehicle registered to the defendant, a gray 1998 Grand Marquis, which was recently observed by members of MPD parked in the parking lot outside of 1401 Erin Street apartment. Third, on March 6, 2019, MPD obtained a search warrant for Jackson's DNA. Fourth, on March 8, 2019, MPD obtained a search warrant for Jackson's cell phone, which was located inside the residence of 1401 Erin Street when he was arrested and taken into custody. The affidavit in support of the cell phone search warrant contained no facts or evidence derived from 1401 Erin Street.

On June 26, 2019, the Grand Jury indicted the defendant, Jamarvin K. Jackson, in a six count indictment alleging violations of Title 18, United States Code, Sections 1951(a), 924(c)(1)(A), and 922(g) as well as Title 21, United States Code,

Sections 841(a)(1) and (b)(1)(D).  Doc. No. 1.  Count 4 of the Indictment alleged that on or about March 6, 2019, the defendant knowingly and intentionally possessed with the intent to distribute a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.  *Id*.  The indictment also contained a Forfeiture Notice. One other codefendant was charged in the indictment for his alleged role in the Hobbs Act robbery that occurred on or about January 26, 2019.  Trial is presently set for October 21, 2019.  Doc. No. 35.

Now before the court are the defendant's three Motions to Suppress and Request for a *Frank's* Hearing. Doc. Nos. 63, 64, and 65.[1]  Specifically, the defendant contends the following in support of suppression:

> 1.) There was no nexus between 1401 Erin Street, Apartment 265 and the evidence sought in the search warrant;
>
> 2.) The residential search warrant affidavit was stale;
>
> 3.) The residential search warrant was a general warrant; and
>
> 4.) The search warrants for the defendant's DNA and cell phone are fruit of the poisonous tree.  Id.

For reasons discussed below, the defendant's request and motions should be denied.

## II.   LAW AND ARGUMENT

### A. Jackson Does Not Have Standing to Object

Before the court considers Jackson's claims of constitutional violations, he must first establish that he has standing to seek suppression of the evidence obtained

---

[1] Undersigned counsel had an erroneous due date docketed on the calendar for the Government's response to the Motions to Suppress which accounts for the untimely response to the defendant's motions.

on March 6, 2019. A court's determination regarding standing to challenge an allegedly illegal search is subject to *de novo* review and its factual underpinnings are reviewed for clear error. United States v. Riazco, 91 F.3d 752, 754 (5th Cir. 1996); United States v. Smith, 273 F.3d 629, 632 (5th Cir. 2001). The proponent of the motion to suppress bears the burden of establishing that the evidence was obtained in violation of his Fourth Amendment rights by a preponderance of the evidence standard. Id.

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Standing to contest a search on Fourth Amendment grounds requires a "legitimate expectation of privacy in the invaded place," and this expectation "must be 'personal' and 'reasonable'" and "have a source outside the Fourth Amendment, either by reference to the concepts of real or personal property law or to understandings that are recognized and permitted by society.'" United States v. Hernandez, 647 F.3d 216, 220 (5th Cir. 2011)(quoting Minnesota v. Carter, 525 U.S. 83, 88 (1998)). Overnight guests in a home may claim protection of the Fourth Amendment, but one who is merely present with consent of the householder may not. Minnesota v. Carter, 525 U.S. 83, 90 (1998); see also United States v. Rios-Davila, 530 Fed. Appx. 344 (5th Cir. 2013) (invited visitor at residence did not have standing to challenge search that began when officers entered backyard without probable cause). Court's held that status as an invited visitor is insufficient to confer standing to challenge a police search. United States v. Majors, 328 F.3d 791, 795 (5th

Cir. 2003) (concluding that the defendant lacked standing to challenge the search of a house since he was "merely a visitor."). Alternatively, a defendant who has standing may lose it if he did or said something, before evidence was discovered, that eliminated his privacy expectations in the evidence or in the place in which the evidence was found. One has no standing to complain of a search or seizure of property he has voluntarily abandoned. Abel v. United States, 362 U.S. 217, 240-241 (1960).

The test for standing under the Fourth Amendment is whether governmental officials violated any legitimate expectation of privacy held by the party seeking to exclude the evidence obtained through the challenged search or seizure. United States v. Lanford, 838 F.2d 1351, 1353 (5th Cir. 1988)(quoting United States v. Parks, 684 F.2d 1078, 1082 (5th Cir. 1982)). Specifically, there is a two-part test. First, did the defendant establish an actual, subjective expectation of privacy with respect to the place being searched or items being seized. Riazco, 91 F.3d at 754. Second, the inquiry shifts to whether that expectation of privacy is one which society would recognize as objectively reasonable. Id.

In this case, the defendant provides an affidavit by the sole leaseholder to apartment 265 located at 1401 Erin Street as proof that the defendant in fact resided at 3513 Parkland Street at the time of the execution of the search warrant. Doc. No. 63-3, pps. 9-13. Jasmine Blair, the documented leased holder for Apt. 265, contends that the defendant periodically spent the night at her home but never resided at the Apartment on Erin Street. Id. What is known is that both the defendant and the

apartment leaseholder, Ms. Blair, were in the residence at the time of the search. The defendant's car was parked outside in the parking lot as was stated in the affidavit accompanying the search warrant. The defendant's presence, by his own characterization, makes him a mere visitor and thus he had no actual, subjective expectation of privacy with respect to the place being searched or items being seized in Ms. Blair's apartment.

The Government acknowledges the affidavit for the residential search warrant could have been written more clearly in some respects. However, there was a nexus between the place to be searched and the items to be seized as will be established during the evidentiary hearing in this matter. MPD's investigation which included witness interviews, criminal history checks, review of social media and public internet data, physical surveillance, etc. indicated that Jackson was presently located at Ms. Blair's apartment, that his car was on the premises and in which he had previously been seen with firearms, and given the most recent assaults, that there was probable cause to believe evidence of a crime would be located there.

B. March 1st Affidavit Not Stale Given Criminal Conduct Spanning January and February

Stale information in an affidavit cannot support probable cause. "The proof must be of facts closely related in time to the issuance of the warrant in order to justify a finding of probable cause at that time." United States v. McKeever, 5 F.3d 863, 866 (5th Cir.1993). When evaluating the staleness of information in an affidavit, the court considers the particular facts of the case, including the nature of the unlawful activity and of the evidence sought, especially whether the evidence "is of

the sort that can reasonably be expected to be kept for long periods of time in the place to be searched." United States v. Craig, 861 F.2d 818, 822–23 (5th Cir.1988)." United States v. Robinson, 741 F.3d 588 (5th Cir.2014). Even if stale information cannot support probable cause, however, officers may be able to execute a warrant in good faith. "To prevail on his fourth amendment claim, [Gallegos] must establish that the facts alleged in the affidavit were so dated that no reasonable officer could have believed that the affidavit established probable cause...." United States v. Pena–Rodriguez, 110 F.3d 1120, 1130 (5th Cir.1997).

In this case, the information establishing probable cause to search was not stale. MPD worked for weeks to develop and identify suspects in the armed robbery of the convenience store and the subsequent assaults that were reported in mid-February 2019. The latter February 2019 assault involved a firearm given the bullet holes in the innocent victim's car. It is common sense that firearms, unlike drugs, are durable goods and are useful to the owners for long periods of time. United States v. Singer, 934 F.2d 758, 763 (7th Cir. 1991). Gun owners typically do not shoot their firearms only once and then discard them. Jackson's role in the aggravated assault occurring on South Grand Street provided evidence establishing his identity as the armed robber of the Family Stop & Shop and established probable cause to believe that he was still in possession of evidence related to the armed robbery i.e., the gun. Therefore, it cannot be credibly maintained that the facts articulated in the affidavit were out of date.

C. <u>The Residential Search Warrant Was Sufficiently Particular</u>

The search warrant affidavit makes clear that MPD sought evidence related to the defendant's unlawful possession of firearms as well as evidence related to armed robbery. Probable cause to search means "a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). The Fourth Amendment requires that a warrant describe with "particular[ity] ... the place to be searched and the persons or things to be seized." The particularity requirement also appears in Federal Criminal Procedure Rules 4(b)(1) (arrest warrants) and 41(e)(2) (search warrants). "It is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." <u>Steele v. United States</u>, 267 U.S. 498, 503 (1925). A "general search warrant" is one that permits a general exploratory rummaging in a person's belongings. U.S. Const. Amend. IV. The test applied by courts is "whether the warrant would permit no discretion to the executing officer in seizing evidence pursuant to the warrant." <u>United States v. Chinwoh</u>, 477 Fed.Appx. 184, 185 (5th Cir. 2012)(affirming denial of motion to suppress). In the instant case, the evidence sought was not overbroad or vague. MPD both arrested the defendant and executed a search of apartment 265. The defense does not challenge the arrest warrant obtained for the Defendant. During the course of the execution of both warrants, Ms. Blair reportedly denied knowledge or ownership of the items discovered by law enforcement. Items recovered included ammunition, suspected controlled substances, and drug paraphernalia located out in the open throughout the

apartment. If the court concludes the items were authorized pursuant to a "general search warrant," such items would have been obtained as a result of a search incident to arrest. MPD sought the firearm used in the armed robbery as well as clothing that appeared in the store surveillance video. The defendant's claims largely focus on the rights of Ms. Blair. However, as previously stated she is not a party to this case.

### D. Law Enforcement Acted in Good Faith

In instances where law enforcement did not have valid probable cause to execute a search warrant, the government may not use evidence seized during an unlawful search as proof against the victim of the unlawful search at criminal trials. See Wong Sun v. United States, 371 U.S. 471, 484 (1963). This "exclusionary rule" also includes the "fruit of the poisonous tree." Exclusion is not constitutionally required, but instead is a "judicially created means of deterring illegal searches and seizures." Penn. Bd. of Prob. & Parole v. Scott, 524 U.S. 357 (1998). It is applied "only where its deterrence benefits outweigh its substantial social costs." Id. (internal quotation marks omitted). Suppression of evidence through the rule "has always been our last resort, not our first impulse." Hudson v. Michigan, 547 U.S. 586, 591 (2006).

The exclusionary rule is not "a personal constitutional right of the party aggrieved." United States v. Calandra, 414 U.S. 338, 348 (1974), and the rule "does not proscribe the introduction of illegally seized evidence in all proceedings or against all persons." Penn. Bd. of Prob., id. at 363 (internal quotation marks omitted).

The Supreme Court created a "good faith" exception to the exclusionary rule in United States v. Leon, 468 U.S. 897 (1984). Evidence obtained pursuant to a

seemingly valid search warrant that was later found to be defective for lack of probable cause was admissible because the officers had reasonably relied on the magistrate's determination that the warrant was supported by probable cause. See United States v. Raymonda, 780 F.3d 105 (2d Cir. 2015), for an illustrative example of the application of this exception.

The Leon Court stated that the good faith exception will not apply in limited circumstances: (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo–Ji Sales, Inc. v. New York, 442 U.S. 319 (1979)"; (3) where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) "depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923. The good faith exception and these rules apply even where the issuance of the warrant is invalid, such that, technically, the search was warrantless at the time it occurred.

In Illinois v. Krull, 480 U.S. 340 (1987), the good-faith exception was applied to evidence obtained by police acting in objectively reasonable reliance on a statute that was subsequently found to violate the Fourth Amendment. In Hudson v. Michigan, 547 U.S. 586 (2006), police violated the knock and announce rule, a rule

with roots in the common law, statute, and the Fourth Amendment. The Supreme Court ruled that the exclusionary rule did not apply. "Suppression of evidence ..., has always been our last resort, not our first impulse." There must be more than a "but for" relationship between the illegality and the seizure. Suppression does not apply where the connection is attenuated. Attenuation occurs when the relationship between the illegality and the seizure is remote, and it also "occurs when, even given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained."

In Herring v. United States, 129 S.Ct. 695 (U.S., Jan. 14, 2009), the Supreme Court found that the exclusionary rule did not apply to require suppression of drugs and a firearm found by officers in a search incident to arrest of a defendant, whom officers unlawfully arrested after receiving incorrect information from a sheriff's department warrant clerk that a warrant was outstanding for his arrest. Even though the Court assumed that the defendant was unlawfully arrested, it decided not to apply the exclusionary rule, noting "[t]he fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." Id. at 700. In declining to apply the exclusionary rule on these facts, the Court explained that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence. The error in this case does not rise to that level." Id. at 702.

The Court's rationale for this decision was tethered to several guideposts, namely: (1) "the exclusionary rule is not an individual right and applies only where

it 'result[s] in appreciable deterrence,'" id. at 700 (quoting Leon, 468 U.S. at 909); (2) "the benefits of deterrence must outweigh the costs," id. at 700; (3) "the extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct," id. at 701; (4) "the pertinent analysis of deterrence and culpability is objective, not an inquiry into the subjective awareness of arresting officers," id. at 703 (quotations omitted); (5) "when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not `pay its way,' " id. at 704. In footnote four of the opinion, the Court suggests that merely negligent conduct is insufficient to invoke the exclusionary rule because it provides only a marginal deterrent effect. See id. at 702 n.4.

In Davis v. United States, 131 S.Ct. 2419 (2011), the Supreme Court declined to apply the exclusionary rule to a search that was legal under New York v. Belton, 453 U.S. 454 (1981), but violated Arizona v. Gant, 129 S.Ct. 1710 (2009), and was conducted before Gant was decided. "[W]e hold that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule. The Court rejected the Petitioner's argument that it was a retroactivity, not exclusionary rule, issue, reasoning that applying a rule retroactively does not dictate the remedy. Gant applied retroactively, "But exclusion of evidence does not automatically follow from the fact that a Fourth Amendment violation occurred."

In Messerschmidt v. Millender, 132 S.Ct. 1235 (2012), the Supreme Court held that police officers were entitled to qualified immunity in a suit alleging that they

obtained a search warrant without probable cause because it was "entirely unreasonable" for an officer to believe that there was probable cause, especially where the warrant was signed by a detached and neutral magistrate. "On top of all this, the fact that the officers sought and obtained approval of the warrant application from a superior and a deputy district attorney before submitting it to the magistrate provides further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause." Messerschmidt v. Millender, id. at 1249. The "decision is significant for criminal law as well as for civil suits under Section 1983, because the Court has held, and reaffirmed today, that the test for the good faith exception to the exclusionary rule is the same as the test for qualified immunity." See also United States v. Needham, 718 F.3d 1190 (9th Cir. 2013) (court decision on Leon issue controlled by § 1983 case); but see United States v. Underwood, 2013 WL 3988675 (9th Cir. Aug. 6, 2013) (distinguishing Messerschmidt).

The Second, Fifth, Sixth, and Eighth Circuits have applied the good-faith exception to save search warrants that contain information tainted by earlier police illegality. See, e.g., United States v. Massi, 761 F.3d 512 (5th Cir. 2014) (collecting cases). Massi was arrested under circumstances that the court later determined were short of probable cause. The defendant argued that a later search warrant, obtained by the same law enforcement team, was fruit of the poisonous tree. The Fifth Circuit rejected this argument.

> Two separate requirements must be met for evidence to be admissible:
> (1) the prior law enforcement conduct that uncovered evidence used in

> the affidavit for the warrant must be "close enough to the line of validity" that an objectively reasonable officer preparing the affidavit or executing the warrant would believe that the information supporting the warrant was not tainted by unconstitutional conduct, and (2) the resulting search warrant must have been sought and executed by a law enforcement officer in good faith as prescribed by *Leon*.
>
> * * * *
>
> Agent Howard did not have the benefit of our judicial hindsight as he worked to obtain and execute a search warrant. To suppress the evidence derived from this warrant would not serve the interest of deterring future constitutional violations.

See also United States v. Wright, 2015 WL 507169 (3d Cir. Feb. 06, 2015) (agent inadvertently did not serve a copy of the list of items to be seized); United States v. Cruz, 2014 WL 7242833 (10th Cir. Dec. 22, 2014) (unsigned warrant); see United States v. Bershchansky, 2015 WL 3513759 (2d Cir. Jun. 05, 2015)(regarding errors in the address). In this case, MPD acted in good faith in obtaining each arrest and search warrant related to the investigation stemming from the January 26th armed robbery. The affidavits articulated Jackson's conduct and how law enforcement was able to develop probable cause of his involvement in the crimes as well as his current location at the time during which he would be arrested and taken into custody. In particular, the affidavit for the defendant's cell phone contained no new facts stemming from the execution of the warrants on March 6th and such evidence should not be suppressed as fruit of the poisonous tree.

### III. CONCLUSION

For the foregoing reasons, all evidence should be admitted. The Government will present testimony and evidence during the evidentiary hearing to rebut the

Page **17** of **18**

contentions in the defendant's motions to suppress. Therefore, the Government requests that the motions to suppress be denied.

        Respectfully submitted,

        DAVID C. JOSEPH
        United States Attorney

        __/s/ Cytheria D. Jernigan_____
        CYTHERIA D. JERNIGAN
        (MA Bar #657960)
        Assistant United States Attorney
        300 Fannin Street, Suite 3201
        Shreveport, Louisiana 71101
        Phone: (318) 676-3600