# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NO. 3:19-CR-00200-01** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **JAMARVIN K. JACKSON (01)** | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court are four motions to suppress [doc. #s 63-65, & 69] filed by defendant, Jamarvin Jackson.   For reasons assigned below, it is recommended that the motions be DENIED.

## Background[1]

On January 26, 2019 at approximately 8:30 pm, the Family Stop and Shop convenience store located at 1403 Orange Street, Monroe, Louisiana was robbed at gunpoint by a man wearing a black ski mask, a gray hoodie, light colored gloves, and black pants.   (Tr. 5-28).[2] Although video surveillance was not clear, the store clerk informed Monroe Police Department ("MPD") officers that the suspect was a black male and that he had brandished a black handgun, possibly a 9 mm.   *Id*.   The robber shot once over the head of the clerk, who quickly handed the robber possibly over $1,000 from two cash registers.   (Tr. 5-28, 80).   Surveillance video confirmed that the robbery took less than 30 seconds.   (Tr. 81-82).   Responding MPD officers retrieved a spent 9 mm shell casing from atop the counter area where the suspect discharged the weapon.   (Tr. 7).

---

[1] The following facts are supported by the evidence and testimony adduced at the December 16, 2019, hearing held in this matter.   The government called five witnesses at the hearing, all Monroe Police Department officers:   Martez Miley, Trey Guillory, Caleb Smith, Triche Passman, and Robert Crowder.   The defense called one witness, Jasmine Blair.   The government introduced 21 exhibits into evidence; the defense introduced three.

[2] Hearing transcript pages are abbreviated as "Tr."

MPD detective Robert Crowder was assigned the case, and on January 28, 2019, he obtained the store video surveillance footage that depicted inside and outside the store from multiple camera angles.   (Tr. 77-84; Gov.'t Exhs. 4-6).   Upon reviewing the videos, Crowder observed the suspect entering the store from the rear of the east side of the store.   *Id*.   The suspect then left the store heading eastbound behind the store on foot.   *Id*.   The surveillance video indicated that just prior to the robbery, another man briefly entered the store, turned around, and then left towards the west from whence he had come, whilst continuing to talk on a cellphone.   *Id*.   Detective Crowder recognized James Blackson as the man who entered and exited the store just prior to the robbery.   *Id*.   In fact, Blackson used to live only one block away from the store.   *Id*.   Crowder was familiar with Blackson because he had investigated several burglaries at a nearby pharmacy, for which Blackson had been identified as a possible suspect.   *Id*.   In addition, Crowder had known Blackson since he was a child.   (Tr. 92). Crowder left word with Blackson's uncle for Blackson to call him.   (Tr. 86).

On February 7, 2019, Blackson telephoned Crowder, and agreed to meet him at the McDonald's restaurant on N. 18th Street.   (Tr. 86-87).   Crowder met Blackson at the restaurant and then transported him to the police station for questioning.   (Tr. 87).   When asked about his presence at the Family Stop and Shop on the night of the robbery, Blackson denied any knowledge of the robbery.   *Id*.   Crowder showed Blackson the video and asked him who he was talking to on the phone.   (Tr. 88).   Blackson replied that he lived down the road and that he was talking to his girlfriend at the time.   (Tr. 89).   He further explained that he was going to pick up his jacket at the store.   (Tr. 89-90).   According to the video footage, however, Blackson did not retrieve anything from the store.   *Id*.

Crowder surmised that because the suspect who robbed the store approached from the

rear and along the side of the store, he would not have been able to see whether any customers, or even police, were at the store.   (Tr. 90-91).   The solution to this issue, at least from Crowder's perspective, was for the robber to have had an accomplice to notify him that it was clear to proceed with the robbery.   *See* Tr. 91.   Because of the brief nature of Blackson's presence in the store, and the close timing with the robbery, it appeared suspicious to Crowder. *Id*.   Moreover, Blackson walked into the store, momentarily went partway down the aisle, and then exited, without purchasing anything.   *Id*.   He also was on his cellphone the entire time he was in the store.   (Tr. 92).

Crowder asked Blackson if he could look at his phone, to which Blackson agreed.   *Id*. As it turned out, however, Blackson had purged his call history of all calls prior to 5 February, i.e., two days earlier, which also happened to be the day that Crowder had left word with Blackson's uncle for Blackson to call him.   (Tr. 92-93).   When Crowder asked him why he had cleaned his call history, Blackson replied that he just likes to clean his phone out.   (Tr. 93-94). After his interview with Blackson, Crowder applied for a search warrant for Blackson's cell phone service provider, AT&T.   *Id*.; Gov't Exh. 7.   The search warrant was approved by the Honorable Larry Jefferson on February 7, 2019.   (Tr. 95-96; Gov't Exh. 7).

Meanwhile, the robbery investigation was bolstered by a series of seemingly unrelated calls on February 18, 2019.   MPD Officer Trey Guillory[3] responded to the initial call at around 9-9:15 p.m. at the Kangaroo Gas station on 1521 North 18th Street.   (Tr. 31, 34).   A woman, later identified as Ms. Stewart, had called in to report that she had been held down and battered

---

[3] Guillory had been employed with the Monroe Police Department for six and one-half years. (Tr. 30).

3

by Jasmine Blair and Jamarvin Jackson in the parking lot of an apartment complex in the 2500 block of Ferrand Street.   (Tr. 31).   Stewart was able to free herself and headed over to N. 18th Street.   (Tr. 32).   Officer Guillory observed a small cut on her lip.   (Tr. 32).   Guillory was unable to locate either Ms. Blair or Mr. Jackson at 2500 Ferrand Street.   (Tr. 34).   A database search for Ms. Blair indicated that she lived at 1401 Erin Street.   (Tr. 33-34).   Guillory requested that a warrant be issued for both parties.   *Id*.

About one hour later that same evening (February 18), MPD Officer Caleb Smith[4] was dispatched to a call again involving a Ms. Stewart in the 2000 block of S. Grand Street.   (Tr. 39-40).   The caller stated that she had heard multiple shots in the area.   *Id*.   Upon investigation, it was discovered that shots had been fired through the back window of a parked vehicle.   *Id*. Smith collected four spent casings off the roadway and retrieved a lead round from inside the vehicle's a/c vent.   (Tr. 40-41).   The caliber of the ammunition recovered from the scene was 9 mm.   (Tr. 49).

Smith spoke with Chrisheena Stewart who advised him that she had heard four to five shots.   (Tr. 44).   She explained that she had reported a battery earlier that evening and suspected that the two incidents were related.   *Id*.   Stewart added that she had a strong suspicion that Jamarvin Jackson was the person who had fired the shots.   (Tr. 45).   Another lady at the scene stated that she had seen a dark-colored sedan and had heard shots at around 9:00 p.m.   (Tr. 46).

MPD Lieutenant Triche Passman[5] reviewed body camera footage from Officer Smith's

---

[4] Smith had been employed by the MPD for one year and eight months.   (Tr. 38).

[5] Passman is a 27.5-year veteran at the MPD.   (Tr. 50).

camera regarding the S. Grand Street request for service.   (Tr. 51-52).   The video revealed that Chrisheena Stewart advised Officer Smith that she had seen Jackson in possession of a solid black firearm on multiple occasions.   *Id*.

Passman testified that when the MPD obtains a firearm pursuant to an investigation it is sent to the National Integrative Ballistics Information Network ("NIBIN") in Shreveport for analysis.   *Id*.   MPD obtained shell casings from the Family Stop and Shop robbery and from the South Grand Street vehicle property damage call.   *Id*.   Some time in late February, Passman received the NIBIN report, which showed that the shell casings had been fired from the same gun.   (Tr. 53).   Passman informed Detective Crowder that NIBIN had matched the shell casings from the Family Stop and Shop robbery with the shooting on S. Grand Street.   (Tr. 96-97).   Prior to the NIBIN results, Crowder was unaware of the incident(s) on February 18.   (Tr. 98).

On, or about February 27, 2019, Crowder interviewed Chrisheena Stewart.   (Tr. 98).   She told him that she had met Jackson in July 2018, while working as a hairdresser.   *Id*.   They then started meeting and talking outside of the salon.   *Id*.   At some point, however, the relationship soured.   *Id*.   Previously, they had hung out at the S. Grand address and on the 2500 block of Ferrand street where Blackson's mother lived.   (Tr. 99-100).   Stewart stated that Blackson and Jamarvin Jackson were best friends, who frequently hung out together.   *Id*.

Stewart further recounted that one day she was driving with Jackson, when he braked suddenly, and she noticed a black firearm slide out from beneath the vehicle seat.   (Tr. 101).   Stewart said that Jackson described the firearm as some type of "millimeter."   (Tr. 101-102).   She then provided Crowder with Jackson's phone number.   *Id*.

Crowder searched social media sites and found photographs of Blackson and Jackson together.   (Tr. 101-105; Gov.'t Exh. 12).   At least one of the photographs included landmarks

that suggested that it was taken at a residence approximately two blocks away from the Family Stop and Shop convenience store.   (Tr. 107-108; Gov't Exh. 13).   Crowder noted that the physical physique of Jackson and the suspect in the video were both very strong, barrel-chested. (Tr. 108-109).   Jackson's and the suspect's shoulders were well-defined.   *Id*.

Through the search warrant for Blackson's call history from his service provider, Crowder learned that Blackson was on the phone with Jackson while Blackson was in the store. (Tr. 110; Gov't Exh. 8).   There were two calls from Blackson to Jackson at 8:03 and 8:31 p.m. (Tr. 112).   Also, according to NCIC, Jackson was a convicted felon.   (Tr. 115-116).

On February 28, 2019, Crowder applied for, and obtained an arrest warrant for Jamarvin Jackson on charges of armed robbery, conspiracy to commit armed robbery, and possession of a firearm by a convicted felon.   (Tr. 116; Gov't Exh. 15).   The arrest warrant included the 1401 Erin Street, Apartment 265 address, together with Jackson's other personal identifiers.   (Gov't Exh. 15).   The warrant affidavit identified two prior felony convictions for Jackson:   negligent homicide and second-degree battery, plus other arrests for domestic violence and possession of controlled dangerous substances.   *Id*.   The warrant and warrant application were signed by the Honorable Marcus L. Hunter.   *Id*.

The next day, on March 1, 2019, Crowder applied for, and obtained a search warrant for 1401 Erin Street, Apartment 265.   (Tr. 116; Gov't Exh. 17).   Both the warrant and application were signed by the Honorable Marcus Hunter, the same judge who authorized Jackson's arrest warrant one day earlier.   *Id*.   The search warrant also included the vehicle registered to the defendant, a gray 1998 Grand Marquis, which was recently observed by members of MPD parked in the parking lot outside of 1401 Erin Street apartment.   *Id*.

6

Crowder used the Erin Street address for Jackson because that was the most recent address they had for him.   (Tr. 116-117).   In fact, the Erin Street address was what Jackson listed on his driver's license.   *Id.*   Crowder added that a Detective Cookson had made contact with Jackson within the past two months at that apartment.   (Tr. 117).   Moreover, Ms. Stewart reported that Jackson lived with his girlfriend at Erin Street, Apt. 265.   *Id.*   Crowder even had a courtesy officer who "stays" at that location to determine who leased and "stayed" at apartment 265 at 1401 Erin Street.   (Tr. 130).   On several occasions, officers conducted surveillance and located Jackson's vehicle there as well.   *Id*.

At approximately 8:00 a.m. on March 6, 2019, officers executed the arrest and search warrants at 1401 Erin Street.   (Tr. 54).   The SWAT team encountered Jackson standing next to his vehicle in the parking lot.   (Tr. 55).   When officers took Jackson into custody, they found a phone on his person.   (Tr. 56, 122).   A search of the vehicle revealed some shell casings, some blue latex gloves, a wallet, and some digital scales.   (Tr. 121).   The gloves appeared to be similar to the gloves worn by the suspect during the robbery of the Family Stop and Shop.   (Tr. 121).

 Apartment 265 is on the second floor of a two-storey apartment building.   *See* Tr. 58. A photograph taken at the scene depicted Jackson's vehicle parked in front of the building. There was one vehicle between Jackson's car and the building.   (Gov.'t Exh. 18).   There was one other apartment visible beneath Apartment 265.   *Id*.

The search of the apartment resulted in the discovery of 9 millimeter bullets on top of the refrigerator.   (Tr. 124-126; Search Warrant Return, Gov.'t Exh. 17).   The officers also found pills and powder cocaine sitting on top of a television entertainment table.   *Id*.   Officers

observed a pickle jar with money and what appeared to be marijuana.   *Id*.   A semi-automatic

handgun was discovered in a dresser drawer in the bedroom.   *Id*.

The officers also found a safe under a bed.   (Tr. 127-128).   They breached the safe back

at the station, where they found a black neoprene wind mask and $1,600-1,700 cash.   *Id*.

Jasmine Blair testified that she resided at 1401 Erin Street on March 6, 2019.   (Tr. 143-

144).   She confirmed that her name was the only one listed on the lease.   (Tr. 145).   She stated

that Jackson lived on Parkland Street at his aunt's house.   (Tr. 146).   She admitted, however,

that Jackson spent the night at her apartment approximately five nights per week, which he had

been doing since Blair gave birth to Jackson's son in July, 2018.   *Id*.

The police placed Blair in a police car while they searched the apartment.   (Tr. 147).

Blair told the police that the safe belonged to Jackson.   (Tr. 127).   Moreover, despite the

presence of some of the contraband in plain view, she denied any knowledge of the items found

in the apartment.   (Tr. 127).

On March 6, 2019, at approximately 10:40 a.m., i.e., within three hours of Jackson's

arrest, Detective Crowder applied for, and obtained a warrant to obtain a DNA swab sample

from Jackson.   (Gov't Exh. 20).   The Honorable Wendell Manning signed both the application

and the warrant.   *Id*.

On March 8, 2019, Detective Crowder applied for and obtained a search warrant for the

cellphone that officers found in Jackson's pocket at the time of his arrest.   (Gov't Exh. 19).

The Honorable Wendell Manning signed both the application and the warrant.   *Id*.

Crowder prepared all of the warrant applications.   (Tr. 131-135).   He was not under

time pressure when he prepared the warrants.   (Tr. 136).   He also did not consult with anyone

8

in the preparation of the affidavits. (Tr. 137).

On June 26 and then on August 28, 2019, pursuant to a superseding indictment, a federal grand jury returned a six-count indictment against Jamarvin K. Jackson on charges of interference with commerce by robbery, use of a firearm during and in relation to a crime of violence, two counts of felon in possession of a firearm, possession with intent to distribute marijuana, and possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. §§ 2, 1951(a), 924(c)(1)(A)(iii), 922(g)(1), 924(a)(2), 841(a)(1), 841(b)(1)(D), and 924(c)(1)(A). The indictment included a forfeiture notice, and also charged James Blackson for his alleged role in the Hobbs Act robbery that occurred on or about January 26, 2019.

On November 13, 2019, Jackson filed three motions to suppress. The first motion [doc. # 63] seeks suppression of all evidence seized pursuant to the search warrant that was executed on March 6, 2019, at 1401 Erin Street, Apartment 265, in Monroe, Louisiana. In support of the motion, defendant argued that there was no nexus between the apartment searched and the evidence sought; the supporting affidavit was stale; the warrant was a general warrant in violation of the particularity requirement; the affidavit included material inaccuracies; the affidavit was not incorporated into the warrant; and the resident of the apartment was not provided with a copy of the search warrant at the time of the search.

The second motion [doc. # 64] seeks suppression of the DNA evidence seized pursuant to an affidavit and search warrant that was executed on March 6, 2019. In support of the motion, defendant argued that this warrant was the fruit of the earlier illegal search and seizure. The warrant also lacked particularity because it failed to incorporate the affidavit by reference.

The third motion [doc. # 65] seeks suppression of evidence relating to the seizure of a cell phone and the examination of its contents pursuant to an affidavit and search warrant that

was executed on March 8, 2019.   Defendant contends that the warrant was the fruit of the earlier illegal search and seizure.   The warrant also lacked particularity because it failed to incorporate the affidavit by reference.

Finally, on December 9, 2019, Jackson filed his fourth motion to suppress.   [doc. # 69].
This motion seeks to suppress an arrest warrant that was signed by Judge Marcus L. Hunter on February 28, 2019.   It was executed on March 6, 2019, at the same time the warrant to search 1401 Erin Street, Apartment 265, was executed.   Defendant argues that there was no probable cause to issue the warrant.

The government filed responses to the motions on December 4 and 13, 2019.   [doc. #s 66 & 72].   Thereafter, the court held a hearing in the matter on December 16, 2019.   [Tr. 73]. The parties filed post-hearing memoranda on February 3, 2020.   [doc. #s 80-81].   Accordingly, the matter is ripe.

## Law and Analysis

### I.      The Fourth Amendment

"The question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution."   *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006).   The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

10

"The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (citations omitted). Evidence obtained in violation of the Fourth Amendment is generally excluded and "cannot be used in a criminal proceeding against the victim of the illegal search or seizure." *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)).   The purpose of this exclusionary rule is to deter unlawful police conduct.   By refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused."   *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)). However, the exclusionary rule is not without limits, and suppression of evidence should be "ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule."   *Id.*

The exclusionary rule also requires the suppression of evidence that is seized pursuant to a warrant unsupported by probable cause.   *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (citation omitted).   A motion to suppress evidence discovered pursuant to a search warrant is analyzed under a two-step process.   *United States v. Sibley*, 448 F.3d 754, 757-758 (5th Cir. 2006) (citation omitted).   First, the court must decide whether the good-faith exception to the exclusionary rule applies.   *Id*.   "'The good-faith exception provides that where probable cause for a search warrant is founded on incorrect information, but the officer's reliance upon the information's truth was objectively reasonable, the evidence obtained from the search will not be

excluded.'" *Sibley, supra* (quoting *United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir.2002)). Because the exclusionary rule is designed to deter misconduct rather than to punish the errors of judges and magistrates, "[e]vidence obtained during the execution of a subsequently invalidated search warrant is *not* excluded *if* the officer executing the warrant relied on it in good faith." *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (citation omitted).   If this good faith exception applies, then the inquiry ends.   *Gibbs, supra*.   The government bears the burden of demonstrating that the good faith exception applies.   *United States v. Gant*, 759 F.2d 484, 487 (5th Cir. 1985).

When an officer obtains evidence in an "objectively reasonable good-faith reliance" on a search warrant, the exclusionary rule's "deterrence rationale loses much of its force," and the evidence is admissible.   *Pope*, 467 F.3d at 916.   "For the good-faith exception to apply, the executing-officer's reliance on the issuing-judge's probable-cause determination and the technical sufficiency of the warrant must have been objectively reasonable."   *Gibbs, supra*. Thus, the reviewing court should defer to an issuing judge's probable cause determination in signing a warrant unless:

(1)     the issuing-judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;

(2)     the issuing-judge wholly abandoned his judicial role in such a manner that no reasonably well trained officer should rely on the warrant;

(3)     the underlying affidavit is "bare bones" (so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable); or

(4)     the warrant is so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

*Gibbs, supra* (citations and internal quotation marks omitted).

The determination of good faith will typically depend upon an examination of the affidavit by the reviewing court.   *United States v. Gant*, 759 F.2d 484, 487-489 (5th Cir. 1985).[6]

      If the good-faith exception does not apply, then the court must proceed to the second step of the analysis and ensure that the magistrate issuing the warrant had a substantial basis to conclude that there was probable cause to support the warrant.   *Gibbs, supra*.

## II.     Search Warrant for the Erin Street Apartment and the Grand Marquis

      As an initial matter, the government contends that defendant does not enjoy standing to challenge the search of the apartment.   The court will address this issue before proceeding to consider defendant's several grounds for challenging the warrant.

      a)    <u>Standing</u>

The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place."   *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *United States v. Parks*, 684 F.2d 1078, 1082 (5th Cir. 1982).   A subjective expectation of privacy is legitimate if it is "one that society is prepared to recognize as reasonable."   *Rakas*, 439 U.S. at 143-44. Furthermore, "[a] houseguest has standing to challenge a search of his host's home because the guest has a legitimate expectation of privacy there."   *United States v. Solis*, 471 Fed. Appx. 409, 410 (5th Cir.2012) (citing *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684 (1990)).

      Here, the evidence establishes that Jackson resided at the Erin Street apartment

---

[6] The court's first step is to examine the affidavit.   *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988).

approximately five nights per week.   Moreover, he was apprehended outside of the apartment at 8:00 a.m., just prior to the search.   Given these circumstances, it is more probable than not that Jackson had spent the night at the Erin Street apartment and consequently, has standing to contest the search.

      b)    <u>Nexus</u>

A warrant affidavit must establish a nexus between the house to be searched and the evidence sought.   *United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir.1996) (citing *United States v. Freeman,* 685 F.2d 942, 949 (5th Cir.1982)).   "That nexus may be established, however, by direct observation or through normal inferences as to where the articles sought would be located."   *Id*. (citations omitted).

Here, defendant emphasizes that the affidavit failed to allege that apartment 265 was defendant's residence, or otherwise set forth how he was connected to the residence.   However, the same judge who signed the search warrant for 1401 Erin Street, Apt. 265, also signed the arrest warrant for Jackson one day earlier, which included the 1401 Erin Street, Apt. 265 address right beneath Jackson's name.   "[T]he magistrate is permitted to 'draw common sense conclusions' from the facts alleged in making a probable cause determination."   *United States v. Chambers*, 132 Fed. Appx. 25, 30 (5th Cir.2005).   Moreover, "[d]irect evidence linking criminal objects is not required for the issuance of a search warrant.   A magistrate need only determine that a fair probability exists of finding evidence."   *Id*. at n.18 (citations omitted).

Given the information known to the same judge via both affidavits and warrants, it is safe to conclude that there was a fair probability of finding evidence linked to the convenience store robbery at the residence where police officers expected to find Jackson for purposes of his arrest.

Moreover, the affidavit stated that the vehicle registered to Jackson was parked in the parking lot at 1401 Erin Street.

In addition, when "determining whether the *Leon* good faith exception applies, the Court may consider not only the four corners of the affidavit, but also 'the circumstances surrounding issuance of the warrant.'"   *United States v. Ricks*, 2016 WL 7048282, at *6 (E.D. La. Dec. 5, 2016) (citation omitted).   Further, "where, as here, the warrant was issued by a state magistrate the federal 'four corners rule' requiring that either the affidavit or recorded oral testimony alone establish probable cause does not apply."   *Id.* (citing *inter alia*, *United States v. Triplett*, 684 F.3d 500, 506 n.3 (5th Cir. 2012).   In fact, in determining whether the *Leon* good-faith exception applies, other circuits have recognized that the court may consider facts outside the affidavit.   *Ricks, supra* (citations omitted).

Here, Detective Crowder – the same officer who applied for both warrants – took pains to ensure that Jackson "stayed" at 1401 Erin Street, Apt. 265.   To be sure, Crowder was aware of other potential residences for Jackson.   However, he corroborated that the 1401 Erin Street address listed by Jackson on his driver's license was a residence that he frequented.   Moreover, surveillance by officers confirmed that Jackson stayed at the apartment.   Detective Cookson had made contact with Jackson within the past two months at that apartment.   (Tr. 117).   Also, Ms. Stewart had reported that Jackson lived with his girlfriend at Erin Street, Apt. 265.   *Id.*

In short, even if the affidavit itself failed to include *direct* facts to indicate that Jackson lived at 1401 Erin Street, Apt. 265, the combination of the two affidavits signed by the same judge within one day of each other, plus the additional investigation performed by the officers rendered it reasonable for the officers to rely on the warrant and infer that the items to be seized

would be found there.   *See Ricks, supra*.

The ultimate question, of course, is "whether the magistrate so obviously erred that any reasonable officer would have recognized the error."   *Messerschmidt v. Millender*, 565 U.S. 535, 556; 132 S.Ct. 1235, 1250 (2012).   This court cannot conclude that the omission in this case satisfied the foregoing criteria.   The oversight certainly was not glaring enough for the state court judge to discern it.   There also is no suggestion that the officers and judge conspired together to issue a deficient warrant.

Defendant suggests that suppression is necessary to uphold the rights of the apartment leaseholder in this case, Ms. Blair.   The court emphasizes, however, that the rule's sole purpose is to deter *future* Fourth Amendment violations.   *Davis v. United States*, 564 U.S. 229, 236–37; 131 S.Ct. 2419, 2426–27 (2011).   If Ms. Blair truly feels aggrieved by the officers' seizure and removal of drugs, firearms, and ammunition from her home and her baby's reach -- the presence of which she was not even aware of - then she may seek recovery under 42 U.S.C. § 1983 for the damages that she sustained.   However, the undersigned does not perceive where suppression of evidence seized from the residence will deter future alleged misconduct where the officers took deliberate steps to ensure that the residence was a valid residence that defendant actually used.

Defendant also complains about factual inaccuracies in the affidavit.   For instance, the affidavit represented that the suspect in the robbery surveillance video appeared to be a black male.   To support his argument, defendant refers to still images from the video, which do not appear to reveal a dark-complexioned individual.   However, Detective Crowder also relied on the description of the robber provided by the store clerks, who saw the uncovered portion of the suspect's face from a distance as close as one foot.

16

Defendant further argues that the affidavit misleadingly stated that Jackson's "physical appearance" was "strikingly similar" to that of the robbery suspect.   Although the robbery suspect's physical features are covered by the gray hoodie in the video, his *physique* may be observed, and it is consistent with photos of Jackson that Detective Crowder had obtained.

Defendant also protests the affidavit's transition to using the name, "Jackson," to refer to the robbery suspect midway through the document.   However, the affidavit does not begin to use Jackson's name for the robbery suspect until after it recounted:   1) that the NIBIN had linked the shell casings from the vehicle shooting and the robbery, and 2) that call history records confirmed that Blackson had made a call to Jackson's cell phone number that lasted up until the time of the robbery.   Certainly by that point, a proper foundation had been laid for referring to the suspect as Jackson.

Defendant raises other potential inconsistencies with the affidavit's characterization of Blackson and Jackson's actions either before, or during the robbery.   For example, defendant contends that the affidavit contradicts itself when it stated that the telephone call between Blackson and Jackson ended "at the exact time that Jackson enters the business," but later states that "Jackson then terminates the call as he approached the front door."   Moreover, the video does not show Jackson on the phone as he approaches or enters the store.   It is manifest, however, that Detective Crowder relied on Blackson's call history records to show that he was talking to Jackson up until the time Jackson approached the store.   In fact, Crowder averred that "[w]hen matched to the time stamp of surveillance footage from Family Stop Foods, the phone call to Jackson began prior to Blackson arriving at the store and ends at the exact time that Jackson enters the business."

Finally, defendant takes exception to the affidavit's representation that "Blackson leaves the store and takes a position where he can continue to act as a lookout until Jackson is in view." While the video does depict Blackson walking away, he does so quite slowly, while periodically looking back over his shoulder towards the store.   Moreover, Blackson still has a line of sight to the front of the store at the time that the suspect entered.

To the extent that the affidavit does not substantially reflect what transpired in the video, any error was not material to the probable cause determination.   The court observes that even if a warrant affidavit contains errors, a "misstatement can vitiate an affidavit only where the misrepresentations are the product of deliberate falsehood or of reckless disregard for the truth." *United States v. Smith*, 609 Fed. Appx. 180, 185–86 (5th Cir.2015) (citation omitted).   Here, however, defendant made no showing that MPD officers *deliberately lied* or *recklessly disregarded* the truth.   Indeed, technical errors do not invalidate a warrant.   *United States v. Almaguer*, 589 F. App'x 285, 286-87 (5th Cir. 2015) (citation omitted).   Accordingly, this argument fails, and the officers could rely on the sufficiency of the warrant in good faith. *Smith, supra.*

Even if defendant had made the requisite showing,

[t]he court must then consider whether the remaining portion of the affidavit is sufficient to support a finding of probable cause. After omitting all intentional or reckless falsehoods, the issue is whether the affidavit contains facts from which the magistrate could make an informed and independent judgment as to whether probable cause existed and whether there was a substantial basis for his determination that probable cause did exist.

*Moreno v. Dretke*, 450 F.3d 158, 169-70 (5th Cir. 2006) (internal citations and quotation marks omitted).

Probable cause exists when under the "totality of the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."   *United*

18

*States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006).   Furthermore, a magistrate requires only a

substantial basis for concluding that a search would uncover evidence of wrongdoing.   *United*

*States v. Allen*, 625 F.3d 830, 840 (5th Cir. 2010) (citation omitted).

Omitting the representations in the affidavit that were challenged by defendant, the

remaining facts suffice to provide probable cause to find that Jackson was the person who robbed

the convenience store.   Indeed, the laboratory report confirmed that the shell casings from the

robbery and the vehicle shooting were fired from the same gun.   Moreover, the victim of the

vehicle shooting identified Jackson as the likely perpetrator of the shooting.   She further stated

that he possessed a black semi-automatic handgun.   Finally, call history records confirmed that

Blackson was having a conversation with someone at Jackson's phone number immediately

before the robbery.[7]

c)   <u>Staleness</u>

Staleness is determined on the facts of each case.   *United States v. Webster*, 734 F.2d

1048, 1056 (5th Cir. 1984).   The courts will not mechanically count the lapsed days or weeks

between the facts set forth in the affidavit and the issuance of the warrant.   *Id*.   "[T]he amount

of delay which will make information stale depends upon the particular facts of each case,

---

[7] In determining whether an affiant's misrepresentation was intentional or reckless, defendant urges the court to consider the factors identified in *United States v. Womac*k:   "exigency, the materiality of the misrepresentation, the officer's level of training, non-disclosure of facts underlying conclusory statements, and whether the officer consulted with an attorney."   *United States v. Womack*, No. 14-0182, 2015 WL 5361421, at *1 (W.D. La. Sept. 14, 2015) (citations omitted), *aff'd,* 675 Fed. Appx. 402 (5th Cir.2017).   Here, while Detective Crowder admitted that there was no exigency, that he did not consult an attorney, and that he was experienced, the alleged mischaracterizations were not material to the probable cause determination.   This factor proves determinative.

including the nature of the criminal activity and the type of evidence sought." *United States v. Freeman*, 685 F.2d 942, 951 (5th Cir.1982) (citation omitted).

Furthermore, "[a]s with other issues concerning probable cause, a magistrate's decision is given considerable deference in the absence of arbitrariness, and the magistrate is expected to act reasonably and use common sense." *United States v. Allen*, 625 F.3d 830, 842 (5th Cir.2010). Therefore, even if stale information does not support probable cause, officers may be able to execute a warrant in good faith. *United States v. Gallegos*, 239 Fed. Appx. 890, 896 (5th Cir.2007). Accordingly,"[t]o prevail on his fourth amendment claim, [defendant] must establish that the facts alleged in the affidavit were so dated that no reasonable officer could have believed that the affidavit established probable cause . . ." *Id*. (citing *United States v. Pena–Rodriguez*, 110 F.3d 1120, 1130 (5th Cir.1997)).

Here, Jackson asserts that over one month elapsed between the convenience store robbery and the warrant application.   He argues that there is nothing in the character of the evidence sought sufficient to suggest that defendant would maintain possession of it one month later. However, a handgun is evidence that a suspect reasonably could be expected to keep at his residence long after a crime. *United States v. Davis*, No. 13-0026, 2013 WL 3148712, at *5 (M.D. La. June 19, 2013) (citations omitted).   Furthermore, courts have held that it was reasonable to believe that a robber will retain in his home the weapon, ski mask, and clothes used in a robbery for more than six weeks, or even three months after the crime. *See United States v. Wesley*, No. 09-0348, 2010 WL 1608299, at *4–5 (E.D. Mo. Jan. 12, 2010), R&R adopted*, 2010 WL 1608406 (E.D. Mo. Apr. 20, 2010), *aff'd,* 648 F.3d 640 (8th Cir.2011) (and cases discussed therein).

Given these circumstances, the court is unable to conclude that the search warrant was so stale that no reasonable officer could have believed that the affidavit established probable cause. The warrant at issue here sought firearms, clothing, and cell phones, which are items likely to be kept long after the crime is committed.

d)      Particularity

"The Fourth Amendment's particularity requirement demands that the place to be searched and the items to be seized be described with sufficient particularity so as to leave 'nothing . . . to the discretion of the officer executing the warrant.'" *United States v. Allen*, 625 F.3d 830, 834-35 (5th Cir. 2010) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)); *see United States v. Hill*, 19 F.3d 984, 987 (5th Cir. 1994) ("The warrant must be sufficiently definite so that the officer executing it can identify the property sought with reasonable certainty." (quotations omitted)).   "In identifying the property to be seized, the agents are required to interpret the warrant, but are not obliged to interpret it narrowly."  *Hill*, 19 F.3d at 987 (quotations omitted).   "Stated differently, the particularity requirement requires the search warrant to describe the property to be seized with reasonable specificity, but not with elaborate detail."  *Id.*   The warrant itself must meet the particularity requirement, not the supporting documents.  *Evans v. Davis*, 875 F.3d 210, 219 (5th Cir. 2017).   A search pursuant to a warrant that does not satisfy the particularity requirement constitutes a "warrantless" search.  *Id.*

Here, the warrant authorized the search for

[a]nd [sic] and all weapons including, but not limited to, handguns, rifles and bullet cartridges.  Clothing that is similar to that of an armed robbery that occurred at 1403 Orange street on 1/26/19 and consists of a grey [sic] zip up hoodie, black pants and or jeans, gloves, facial concealments such as ski masks or similar items and any and all cell phones located inside the residence.

Defendant emphasizes that the supporting affidavit only provides probable cause to search for a "black semi-automation [sic] handgun," that was used in the robbery.   He further argues that the affidavit cannot be used here to bolster the warrant's lack of particularity because the warrant did not incorporate the affidavit by reference, nor was the affidavit attached to the warrant.   *Groh v. Ramirez*, 540 U.S. 551, 557–58; 124 S.Ct. 1284, 1289–90 (2004).

Addressing defendant's latter argument first, the court notes that the same judge who signed the warrant in this case also signed the accompanying affidavit.   Moreover, the page numbers on the affidavit and warrant are numbered as part of one whole document, e.g., page 1 of 5, etc., thereby linking or incorporating them together.   Accordingly, the affidavit and warrant may be read together, and when this is done, the description of the firearm is sufficiently particular.   Also, given the unknown model of the firearm, it is difficult to imagine how the description of the bullets could be much more detailed.   Furthermore, the application and warrant described specific clothing items that were used during the armed robbery.

At minimum, the affidavit and warrant described, with sufficient particularity, the semi-automatic handgun, the bullet cartridges, the ski mask, the gray zip up hoodie, and the gloves. The court may suppress any other items that were not sufficiently described within the warrant and application.   *See United States v. Cook*, 657 F.2d 730, 735 (5th Cir.1981).   To the court's knowledge, however, no other handguns or rifles were found.

With regard to the drugs and other paraphernalia that the officers found in the apartment, the aptly named "plain view doctrine" authorizes law enforcement to seize evidence in plain view, even without a warrant.   *United States v. Paige*, 136 F.3d 1012, 1023 (5th Cir. 1998) (citations omitted).   The Fifth Circuit has recognized that,

22

[a]s a general rule, only items that are described in a search warrant may be seized in accordance with Fourth Amendment concerns. An exception to this general rule, however, is found where a police officer has a warrant to search a given area for specified objects and in the course of the search comes across some other article of incriminatory character. The property is then seizable under the plain view doctrine. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir.2005) (citations and internal quotation marks omitted.

A plain view seizure presupposes four conditions:

> (1) the officer conducting the seizure must lawfully arrive at the position from which the object is plainly seen;

> (2) the object must be in plain view;

> (3) the object's incriminating character must be immediately apparent- i.e., the officer must have probable cause to believe the object is contraband or evidence of a crime; and

> (4) the officer must have a lawful right of access to the object itself.

*Paige, supra* (citations omitted).

Here, the testimony as to where the contraband was found in the apartment, plus the attendant photographs, confirm that the seizure of the drugs and associated paraphernalia comported with the plain view doctrine.   The officers were in the home pursuant to a valid search warrant looking for a specific firearm and specific clothing items used in the robbery. The items seized were in plain view, their incriminating character was apparent, and the officers had the right to access the objects.   There is no indication that at the time the officers observed the items in plain view they had found all of the items for which they held a valid warrant.   For example, the ski mask was not discovered until the safe was opened later at the station. Moreover, the officers never found a gray hoodie.[8]

---

[8]   "The record in the present case reveals that none of the items for which probable cause existed were found at the house.   Thus had the agents been acting under a severed warrant, they would not have been required to stop at any point in the search."  *Freeman, supra*

Defendant further argues that the warrant's description of "any and all cell phones located inside the residence" was too broad.   Be that as it may, the only cell phone seized by the officers was Jackson's phone, which was found on his person at the time of arrest.   Of course, the police are authorized to search the arrestee's person and the area within his immediate control.   *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040 (1969).   The officers subsequently obtained a separate warrant to search the contents of the phone.   *See* discussion, *infra*.

    e)    <u>Presentment</u>

Defendant protests the fact that neither the affidavit, nor the search warrant were provided to his girlfriend and mother of his child, Ms. Blair, at the time the apartment was searched.   Rather, it was not until a few days later that Blair received a copy of some of the pages that comprised the warrant and application package.   Insofar as defendant even has standing to contest law enforcement's failure to provide a non-party with a copy of the warrant before conducting a search of the non-party's residence, the Supreme Court has held that the Fourth Amendment does not require the executing officer to present the property owner with a copy of the warrant before conducting the search.   *United States v. Grubbs*, 547 U.S. 90, 98–99; 126 S.Ct. 1494, 1501 (2006).

Furthermore, the Fifth Circuit has recognized that to warrant suppression for failure to present a copy of the search warrant contemporaneous with the search, a criminal defendant must show that he was prejudiced by the omission, i.e., that he was "subjected to a search that might not have occurred or would not have been so abrasive had the rule been followed . . ."   *United*

*States v. Wijetunge*, No. 15-144, 2015 WL 5098667, at *6 (E.D. La. Aug. 31, 2015).   Needless to say, defendant has not made that showing here.   Ms. Blair conceded that Jackson stayed at the Erin Street apartment five nights per week.   Moreover, it is unlikely that Blair could have offered to retrieve any of the items for the officers herself because she did not even know the contraband was in the apartment.

      f)    <u>Vehicle Search</u>

Defendant reiterated many of the same arguments that he advanced in support of suppression of the items seized in the apartment for purposes of suppressing the items found in the vehicle.   However, the court's disposition of these arguments as to the residence dictates the same outcome as to the automobile.   Moreover, considering that the affidavit included facts showing that Jackson traveled to S. Grand Street and discharged the same weapon there that was used in the robbery, there is probable cause to believe that he used his vehicle to travel to the S. Grand Street location.   Furthermore, the officer who applied for the warrant was aware that Ms. Stewart had stated that she had seen a firearm that fit the description of the firearm at issue beneath the vehicle seat.

The court also notes that, the same rationale that supports the finding that persons are likely to keep durable items such as firearms and clothing in their home for extended periods of time, supports the determination that they might also keep these items in their car long after a crime is committed.   Indeed, many persons treat their vehicles as mobile storage units. Regardless, the court is unable to conclude that the affidavit and warrant were so stale that no reasonable officer could have believed that the affidavit and warrant established probable cause to search the vehicle.

## II.      DNA Search Warrant

Defendant seeks to suppress DNA evidence seized from him pursuant to a search warrant

issued on March 6, 2019.   In support of his motion, he re-urged his argument that all of the

evidence obtained pursuant to the search of 1401 Erin Street, Apt. 265 and his vehicle should be

suppressed, and thus, the DNA warrant was fruit of the foregoing illegal search and seizure.   He

also argued that the warrant was constitutionally deficient because it lacked particularity by

failing to incorporate the affidavit by reference.

The court, however, has found no antecedent fourth amendment violation associated with

the search and seizure of evidence at 1401 Erin Street, Apt. 265 and defendant's vehicle.   *See*

discussion, *supra*.   Further, the same judge signed both the warrant and the supporting affidavit

to obtain the DNA sample.   *See* Gov.'t Exh. 20.   Moreover, the pages of the affidavit and

warrant were numbered as part of one whole document, thus indicating that the one incorporated

the other.

In addition, the Supreme Court has held that

> DNA identification of arrestees is a reasonable search that can be considered part
> of a routine booking procedure. When officers make an arrest supported by
> probable cause to hold for a serious offense and they bring the suspect to the station
> to be detained in custody, taking and analyzing a cheek swab of the arrestee's DNA
> is, like fingerprinting and photographing, a legitimate police booking procedure
> that is reasonable under the Fourth Amendment.

*Maryland v. King*, 569 U.S. 435, 465–66; 133 S.Ct. 1958, 1980 (2013).

Under Louisiana law, a person who is arrested for a felony shall have a DNA sample drawn or

taken at the same time he is fingerprinted pursuant to the booking procedure.   La. R.S. § 15:609.

Here, it appears that defendant's DNA sample was taken at, or not long after

booking.   This procedure is required by Louisiana law, and does not offend the

Constitution.   In short, a warrant was not even required.

### III.    Cell Phone Search Warrant

Defendant seeks to suppress evidence relating to the seizure of his cell phone and the examination of its contents pursuant to a search warrant issued on March 8, 2019.   In support of his motion, he re-urged his argument that all of the evidence obtained pursuant to the search of 1401 Erin Street, Apt. 265 and defendant's vehicle should be suppressed, and that the cell phone evidence was fruit of the foregoing illegal search and seizure.   He also argued that the warrant was constitutionally deficient because it lacked particularity by failing to incorporate the affidavit by reference.

The court, however, has found no antecedent fourth amendment violation associated with the search and seizure of evidence at 1401 Erin Street, Apt. 265 and defendant's vehicle.   *See* discussion, *supra*.   Moreover, the same judge signed both the warrant and the supporting affidavit to search the phone.   *See* Gov.'t Exh. 19.   In addition, the pages of the affidavit and warrant were numbered as part of one whole document, thereby confirming that the one incorporated the other.

### IV.    Arrest Warrant

Defendant seeks to suppress the February 28 warrant that was issued for his arrest essentially on the same grounds that he sought to suppress the evidence obtained via the search warrant for 1401 Erin Street, Apt. 265 and his vehicle.   However, the court's resolution of defendant's argument relative to the search warrant also disposes of his parallel argument relative to the arrest warrant.   Furthermore, the arrest warrant sought Jackson's arrest not only for armed robbery and conspiracy to commit same, but also for possession of a firearm by a

convicted felon.   Stewart's statement to Detective Crowder that she had observed Jackson in possession of a firearm, together with Jackson's criminal history, provided more than sufficient probable cause to support defendant's arrest.

With regard to defendant's argument that the warrant was constitutionally deficient because it lacked particularity by failing to incorporate the affidavit by reference, the court observes that the same judge signed both the warrant and the supporting affidavit.   *See* Gov.'t Exh. 15.   Also, the pages of the affidavit and warrant were numbered as part of one whole document, thereby confirming that the one incorporated the other.   *Id.*

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the motions to suppress [doc. #s 63-65, & 69] filed by defendant, Jamarvin Jackson, be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE**

**SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 11th day of February 2020.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE